Filed 10/18/24  P. v. Player CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C095341 |
| Plaintiff and Respondent, | (Super. Ct. No. 21F3425) |
| v. | |
| ADRIAN GERARDO PLAYER, | |
| Defendant and Appellant. | |

Defendant Adrian Gerardo Player appeals from his convictions of resisting an executive officer with force, battery upon a peace officer, and willful harm to a police dog.  (Pen. Code, §§ 69; 243, subd. (b); 600, subd. (a) [statutory section citations that follow are found in the Penal Code unless otherwise stated].)  He contends the prosecutor committed prejudicial misconduct by not admonishing witnesses not to make statements prohibited by the trial court, insinuating in questions that defendant was under the influence of methamphetamine, and by making provocative and untrue statements in

1

closing argument.  Defendant further contends the trial court erred by denying his motions for a mistrial that were based on the misconduct, admitting unduly prejudicial evidence, committing cumulative error, and by sentencing him to an upper prison term in violation of the requirements of section 1170.  He also asks us to determine whether the trial court abused its discretion when it determined not to disclose any information contained in the personnel records of the peace officers involved in his arrest.

Except to remand for resentencing, we affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

A.      *Prosecution*

On the evening of May 10, 2021, Vanessa O. was riding her bike on her Redding street when she saw an unfamiliar man.  The man had two backpacks.  Passing the man, Vanessa saw him use a phone to take pictures of one of her neighbor's houses.  Vanessa knew the house the man was photographing was vacant.

Returning from her bike ride, Vanessa saw the same man on the property of a different house that was under construction.  After "furtively" looking around, the man went onto the property and disappeared.  Concerned that the man might stay in the house for the night, Vanessa called her neighbor, Warden Aaron Galwey, whom she knew was in law enforcement, and asked him to check out the situation.

Warden Galwey is a peace officer with the California Department of Fish and Wildlife.  Vanessa described the unknown man to Galwey as having long hair, tattoos, and a darker complexion, possibly Hispanic or Hawaiian.   Galwey told Vanessa he was on his way home, and he would see if he saw a man matching that description on his way.

Warden Galwey was not on duty at the time.  He was wearing hiking pants, a t-shirt, and flip flops.  He was not armed.  He and his son were driving an off-road vehicle similar to a golf cart when he saw an individual matching Vanessa's description standing on the front porch of the house under construction and looking in the windows around the

2

front door. Galwey called the police and described the situation. He believed the fact the man was looking in windows, instead of just walking down the street, warranted law enforcement contact. Galwey and his son stopped their vehicle down the street from the house, and he walked back to contact the individual, whom Galwey identified at trial as defendant.

Warden Galwey asked defendant if he could help him find something and if he knew where he was going. Defendant immediately stated, " 'Hey, this is a really safe neighborhood. Everyone keeps wanting to talk to me. I want to live here.' " Galwey replied, " 'Well, it's nice we just don't like when people are looking in windows and they are on private property.' " Galwey asked if he could help defendant get somewhere and stated, " 'Hey, you need to leave if you're in people's yards. Like you can't be behind their fences you've got to go.' "

While Warden Galwey had been talking with defendant, the owner of the house under construction, Joan M., was driving down the street. It was almost 8 o'clock. She saw someone milling around in her house's yard. He was wearing a tank top and shorts, and he had a backpack and long dark hair. Joan stopped her car and asked the man what he was doing. The man refused to leave, so Joan made a U-turn and parked her car in front of a neighbor's house with her lights shining on the man. She then saw another person talking with the man. The second person walked over to her car and identified himself as Warden Galwey. Galwey informed Joan how he was involved and that the police were on their way.

Redding Police Officer Kyle Lovelady arrived at the scene in his marked police car and in uniform a few minutes before 9:00 p.m. As Officer Lovelady arrived, defendant began to walk away towards the opposite side of the roadway. He was carrying a backpack and a duffle bag. After Lovelady got out of his vehicle about 50 feet away from defendant, defendant turned his back on him and put his hand in his pocket while he was walking off. Warden Galwey told defendant not to walk with his hands in

his pockets and to take his hands out of his pockets. This statement alerted Lovelady that defendant potentially had weapons in his pockets.

Officer Lovelady identified himself as Redding Police. Defendant continued to walk away until Lovelady called him back towards his direction to be searched. Lovelady knew that defendant was subject to warrantless searches. He told defendant to drop his bags, turn around, and interlace his fingers behind his head. Defendant placed both bags on the ground. He started stepping backward and asking why. Lovelady told him he was going to conduct a search of his person, and if there was nothing illegal on him, he would most likely be free to leave.

Defendant said that Officer Lovelady was not going to touch him. He took a step back and began to pick up one of his bags. Lovelady again told defendant to place the bag on the ground, turn around, and interlace his fingers behind his head. Lovelady said it was an order. Defendant said no. Lovelady repeated the command, and defendant still did not comply.

At this point, Officer Lovelady told defendant he was under arrest. Lovelady also advised his dispatch, and through dispatch his backup officer, that defendant was not complying with orders. Lovelady again repeated his order to defendant to turn around and interlace his fingers behind his head. That was how he was going to arrest defendant if he complied. Defendant did not comply.

Officer Lovelady pulled out his pepper spray. Lovelady was designated an expert in the use of force. He explained there were multiple levels of force, and pepper spray was a very low use of force because it caused only temporary discomfort. He would use it when someone was not complying with his orders. It was a higher level of force than verbal commands or just trying to talk to someone. Pepper spray was his next step of force to effect the arrest and take defendant into custody without "going hands-on" and risk hurting himself.

4

Officer Lovelady shook the pepper spray in front of defendant to display his intent to use it. Defendant placed his hands in front of his face as if to block the spray from hitting him. Lovelady moved to the side to get a direct path, and he sprayed the pepper spray in a one-to-two second burst towards defendant's face. The spray hit defendant's face. His eyes shut and he began yelling. Lovelady informed dispatch he had deployed the spray.

After spraying defendant, Officer Lovelady ordered him to get on the ground and lay flat on his stomach. Defendant refused, and he continued standing and rubbing his eyes. He began opening his eyes, and Lovelady sprayed him with the pepper spray again. Defendant's eyes closed, he yelled, and he eventually went down to his knees. Lovelady told him he was under arrest multiple times. Defendant screamed " 'Don't kill me,' " and " 'Don't shoot me.' " He said he did not do anything wrong.

Officer Lovelady told defendant all he had to do was get on the ground and that he was under arrest. But defendant stayed on his knees. Lovelady sprayed him a third time in the face, this time for three-to-four seconds, because defendant still was not complying and was rubbing his eyes. The spray was not resulting in gaining defendant's compliance as it normally did with the average person.

Believing defendant was a danger to him, Officer Lovelady decided "to go hands-on." He walked around defendant, who was still kneeling, and while telling him to get on the ground, pushed him using both of his hands on defendant's back. Defendant fell forward and caught himself with his hands. He pushed himself back up onto his hands and knees and locked his elbows.

At that point, Warden Galwey grabbed hold of defendant's right arm, and Officer Lovelady tried to get defendant's left arm behind his back to effect the arrest. The men were unable to physically force defendant's arms behind his back. Lovelady explained that a person can be high on adrenaline or even drugs and can overcome the force that two grown men may use against that person.

Defendant clenched his left fist and started swinging his arm at Officer Lovelady. His elbow and his arm hit Lovelady while he was swinging it. Defendant went from kneeling to sitting and started kicking and punching at Lovelady, striking the officer two to three times and kicking him four to five times. Lovelady drew his straight stick baton and hit whichever leg or arm defendant used to hit him. Officers are trained to strike extremities that are actually kicking or punching them because those extremities are not near body areas they do not want to strike.

Hitting defendant with the baton, Officer Lovelady used both of his hands and swung the baton as hard as he could. It did not seem to have any effect on defendant. This scared Lovelady because a normal person getting hit that hard with a baton would comply. He had struck people before, "and it was nothing like this." He struck defendant approximately once in the hand, two to three times in the forearm, and two to three times in the bicep. But defendant continued to yell and resist; the baton strikes did not affect his ability to fight. Warden Galwey was "shocked" by defendant's lack of response to the strikes.

Officer Lovelady decided to use his taser. He removed it from his belt, turned it on, and yelled, " 'Taser, taser.' " He shot the taser to defendant's chest. He explained to the jury that the taser has a battery cartridge with a regular trigger and two pieces of metal on its end that could be used as a stun gun. A cartridge attaches at the end that shoots two barbed probes attached to thin copper wires. When both probes attach to skin, the taser sends an electrical charge to the body which contracts the muscles. More muscle mass is constricted the farther away from the victim the taser is shot and the greater the distance between the barbs. Lovelady was fairly close to defendant when he fired the taser, and the probes were separated by only a foot. Nonetheless, he thought it would have been effective.

But defendant immediately began pulling out the probes, rendering the taser ineffective. Officer Lovelady thought one probe was still attached to defendant, who was

6

lying on his right side by that time, so he placed the taser on defendant's left thigh in dry stun mode to get a second connection. That seemed to work, but defendant reached down and grabbed the taser. Lovelady wrestled the taser from defendant's hands, and defendant resumed kicking and punching.

Officer Lovelady tried to grab one of defendant's arms and force him back down to the ground. Lovelady ended up on top of defendant, who was on his back. Defendant grabbed Lovelady's groin. Lovelady punched him in the face. Lovelady had radioed several times for assistance, and Redding Police Officer Travis Williams had arrived with his German shepherd K9. Lovelady told Williams to send in the dog.

Officer Williams saw that defendant was violently resisting and was swinging at Officer Lovelady. He told defendant to get on the ground or he would be bit. Williams released the dog, and the dog bit defendant on his lower right leg. Defendant sat up, grabbed the dog by the head, and began punching the dog with both fists. Lovelady struck defendant in the arms, and Williams tried to grab one of his arms. Defendant grabbed Williams's pant leg.

Williams stepped back. He pulled his taser off his belt, told defendant he was going to tase him, and shot the two probes into defendant's upper chest. It had no effect on defendant, who tried reaching for the probes to pull them out. Williams tried to touch defendant with the taser, but defendant kicked toward Williams and tried to grab the taser out of his hands. Williams pulled the taser out of defendant's hands and put it back in his belt. He deployed his baton and struck defendant in his arms between five and seven times. Williams yelled at defendant that if he would just stop resisting, this would all stop. Officer Lovelady also struck defendant with his baton, all to no effect.

Defendant attempted to put his hands inside a spandex brace that was wrapped around his belly, and he rolled towards his left side to try to get up. Facing defendant's back, Officer Williams struck defendant in the right shoulder approximately five times with his baton to keep him on the ground, again without effect.

7

With Warden Galwey's assistance, the officers grabbed defendant and "dogpile[d]" him onto the ground on his stomach. The K9 was still biting defendant's leg. At some point, Galwey struck defendant with his knees twice and pulled defendant's hair to get him to the ground. Galwey pulled defendant's left hand behind his back and yelled at Officer Lovelady to get handcuffs. Lovelady was able to cuff defendant's left wrist. Officer Williams grabbed defendant's right arm and, using almost his entire body weight, pulled the arm out straight as defendant kept grabbing Williams's hand and pulling his arms. Lovelady laid on top of defendant with all his weight to keep him on the ground. Lovelady moved his body forward to where his head was above defendant's, and Williams was able to place the handcuff on defendant's right wrist. Although there were some lulls, defendant had screamed throughout the entire altercation.

Defendant continued to roll side-to-side and kick. Officer Lovelady double locked the handcuffs. Officer Williams released the dog from defendant and put him back inside the patrol car. Other officers arrived and put defendant in leg restraints. Defendant was searched, and no weapons were found. Inside his bags, officers found a small amount of marijuana, which was not of interest, and a clear glass pipe of the type commonly used to smoke methamphetamine.

Defendant suffered abrasions on his face, bruising and swelling over his extremities and face, several dog bite lacerations, a broken bone in his left hand, and other injuries consistent with being struck by a baton. He wore a "bellyband" made of neoprene fabric about one foot wide wrapped around his abdomen and connected by Velcro. Neoprene fabric could prevent taser probes from working effectively.

Officer Williams requested an ambulance for defendant and to have chemical restraints ready. But Williams learned the ambulance would not arrive quickly, so the officers placed defendant in the back of a larger patrol vehicle and transported him to the hospital. Williams was concerned that defendant might have been experiencing "excited

delirium," a condition that may occur when a subject has used stimulants or other types of narcotics and that can cause an extremely elevated heart rate and temperature.

At the hospital, defendant remained combative. He attempted to assault nurses and other medical staff. As the staff attempted to put him in soft restraints, he swung at one of the nurses. He continually tried to resist them and seemed incoherent. Ultimately, defendant was cleared medically and taken to jail.

Officer Lovelady suffered abrasions on his shins and knees. Officer Williams suffered pain in both his wrists and a scratch on his face. Warden Galwey suffered bloodied hands, knees, and feet and scratches on his arms. It took "every bit of energy [Galwey] had left" to help cuff defendant. In his 17 years of law enforcement, Galwey had never seen an individual continue to fight the way defendant fought. During the encounter, Galwey did not identify himself as a law enforcement officer.

B.    *Defense*

Defendant's arrest occurred on the perimeter of property owned by Michelle P. That night, Michelle got out of bed when she heard people yelling. She went outside to her side yard and saw Redding police officers beating up a person on the ground with batons, tasers, and mace as they tried to arrest him. The officers were screaming at the person to turn over and get on his stomach. Michelle said she "kind of went into shock" at the sight, as she had never seen anyone get beat up like that before.

When Michelle saw an officer arrive with a dog, she went inside and got her phone. She wanted to take a video because she was not sure if someone was going "to end up dead" on her property. While the officers were beating the individual, Michelle heard the person say, " 'Don't shoot me, don't shoot me, don't shoot me.' " She thought the person was "screaming the whole time" before she got her phone. She used her phone to record a video of the altercation, and she gave the video to a Redding police

9

officer that night along with a statement. She never watched the video again, as she wanted to erase it from her mind. The video was played to the jury.

Michelle told the officer the beating was "pretty bad" and that she was scared "the guy was going to get killed." She had never seen someone take a beating "like that and still be alive." She did not see the officers use any de-escalation tactics. She told the officer she thought the man on the ground was going to be murdered and killed by the police.

Michelle did not know and did not remember whether the man on the ground was hitting the officers during the beating. She also did not know if he was kicking or assaulting the officers. It was dark and she could not see. She also did not see what led up to the individual screaming.

Zalina Galashty, Shasta County senior deputy public defender, represented defendant for his arraignment on May 13, 2021, three days after the incident. Defendant had extensive injuries on his face and entire body. Galashty took photographs of defendant's injuries, which were entered into evidence.

C.    *Judgment*

A jury found defendant guilty of two counts of felony resisting an officer with force or violence, two counts of misdemeanor battery upon a peace officer, and misdemeanor willful harm to a police dog. (§§ 69 [counts 1 and 2]; 243, subd. (b) [counts 3 and 4]; 600, subd. (a) [count 5].) Implicit in the jury's verdict was a finding that the officers did not use unreasonable or excessive force in detaining and arresting defendant. (CALCRIM Nos. 2652, 2656, 2670.) The trial court found true allegations that defendant had twice been previously convicted of serious or violent felonies for purposes of the Three Strikes law. (§ 1170.12.)

The trial court denied defendant's motion to strike a strike prior. It sentenced defendant to an aggregate prison term of seven years, four months: the upper term of

three years on count 1, doubled to six years under Three Strikes; plus one-third the midterm of eight months on count 2, doubled to one year, four months. The court sentenced defendant to one year each for counts 3 and 4, and it stayed imposition of those sentences under section 654. It also sentenced defendant on count 5 to 180 days to be served concurrently.

DISCUSSION

I

*Prosecutorial Misconduct*

Under the federal Constitution, conduct by the prosecutor constitutes prosecutorial misconduct if it " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.) Under California law, misconduct occurs "when a prosecutor uses ' " ' "deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070-1071.)

Defendant contends the prosecutor committed misconduct on numerous occasions. Defendant asserts the prosecutor did so by (1) twice failing to admonish witnesses not to make specific statements which the trial court had prohibited in earlier in limine rulings; (2) asking questions that insinuated without substantiation that defendant was under the influence of methamphetamine; and (3) making statements in closing argument that were unduly prejudicial and mischaracterized Michelle's testimony based on information not admitted into evidence. We address each assertion of misconduct.

A.    Not admonishing witnesses

One form of prosecutorial misconduct is eliciting or attempting to elicit inadmissible evidence in violation of a court order. (*People v. Crew* (2003) 31 Cal.4th 822, 839.) Defendant contends the prosecutor committed prejudicial misconduct by not

11

admonishing his witnesses not to make specific statements that the trial court had ruled were inadmissible during in limine rulings and by eliciting the prohibited statements from those witnesses.

### 1.　　Background

Defense counsel filed an in limine motion to exclude any evidence or testimony concerning defendant's parole status.  The trial court granted the motion under Evidence Code section 352 and in light of defendant's stipulation that the attempted search was not unlawful and that he was subject to warrantless search.  The stipulation read to the jury stated, " 'The parties stipulate that Officer Lovelady could conduct a search of [defendant] and/or his property without a warrant and that such a search would be within the lawful performance of the officer's duties.  The officer could detain [defendant] for the purposes of conducting the search.' "

In the in limine motion, defense counsel also sought to preclude Redding Police Officer Austin Lobsinger, one of the officers that responded to the location of the arrest, from testifying that as he monitored the radio while responding, he heard multiple "mic keys where i[t] sounded like Officer Lovelady was in a fight for his life."  The trial court granted this motion.

During Officer Williams' testimony, the following colloquy occurred:

"Q  [The prosecutor]:  Did you hear anything as you were approaching over the radio that caused you concern?

"Defense counsel]:  Objection, calls for hearsay.

"THE COURT:  Overruled being offered for the effect on the listener.

"A  [Officer Williams]:  Yes.

"Q:  What was that?

"A:  I heard Officer Lovelady advise that he had pepper sprayed the subject.

"Q:  And why was that a concern?

"A:  Because oftentimes the use of pepper spray on a resisting subject will cause almost immediate compliance.

"Q:  Did anything else you heard over the radio after that cause you concern?

"A:  I don't know if it was before or after that, but I recall Officer Lovelady advising that the subject had advised that he was on parole."

Defense counsel objected, and the court admonished the jury, "Jurors, I am going to strike from the record the last question and answer given in this matter.  And I'm going to instruct you since I'm striking it for the record to disregard it.  You may not consider that question or answer for any reason whatsoever."  The court then excused the jurors for a recess.

Defense counsel moved for a mistrial.  She argued the prosecutor had been ordered to admonish his witnesses not to mention defendant's parole status.  Yet the witness had disclosed the parole status, which was prejudicial, and was grounds for a mistrial.

Replying, the prosecutor attempted to focus the discussion on whether a jury instruction would be sufficient.  Defense counsel asked the prosecutor whether he had admonished the witness not to talk about defendant's parole status.  The prosecutor stated he believed he had but was not certain.  The court brought Officer Williams into the courtroom, and Williams stated he had not been instructed that evidence of defendant's parole status was not to be presented in front of the jury.

After reviewing authorities on the matter, the trial court denied the motion for mistrial.  It stated it always presumes jurors will follow its instructions.  It also relied on the fact there had been no pattern of egregious conduct by the prosecutor.  The prosecutor erred by not admonishing the witness, "and although the Court is not happy about that error, especially in light of the fact that the Court very clearly indicated to both counsel to advise their witnesses of the Court's rulings and motion in limine, I don't find that it was intentionally done or that there was any intentional misconduct on the part of the

13

prosecution. [¶] The Court notes that this was a single, brief remark that was volunteered by the witness. I don't believe the prosecutor led him into volunteering that remark . . . ." The court stated it had immediately addressed the misconduct by striking the statement and admonishing the jury to disregard it.

The next day at trial, Officer Lobsinger testified he had responded to a call that Officer Lovelady was involved in a physical altercation with a subject. The dialogue continued:

"Q [The prosecutor]: As you were responding were you monitoring the radio?

"A: Yes, I was.

"Q: Did you hear anything in relation to this call?

"A: Yes. I heard multiple mic keys and yelling.

"Q: What is a mic key?

"A: So we typically carry a mic on us, a radio, and when it starts clicking either we're in a physical altercation status most likely from my experience – from what I've experienced personally. So you fight with somebody and the mic accidentally clicked and that just – it sounds bad because you hear yelling in the background it sounds like somebody is fighting for their life."

Defense counsel objected. The court sustained the objection, struck Officer Lobsinger's last statement, and admonished the jurors to disregard it. It excused the jurors, and then it asked Lobsinger whether anyone had instructed him of the court's ruling that his opinion that Officer Lovelady was in a fight of his life was excluded from testimony. Lobsinger replied, "I don't exactly recall that part, but I know I was not supposed to talk about other stuff which I did not bring up that was in my report. I don't recall that part though."

Defense counsel moved for a mistrial. She argued this was the second time the prosecutor had elicited information in violation of a court order. It was now a dangerous pattern, and the prosecutor was being allowed to "get into stuff" that the court had

14

excluded. She asserted that at this point, the jury was poisoned, and striking the statement and giving another instruction was not enough.

The prosecutor explained he had told Officer Lobsinger "not to communicate opinions that he formed about what he was hearing when he was asked questions about what he was hearing over the radio without getting the Judge's approval." The prosecutor intended and did his best to convey the court's order to Lobsinger and to be broader than the order. The prosecutor also argued that Lobsinger's statement did not violate the court's order. The court's order prohibited Lobsinger from testifying he thought Officer Lovelady was in a fight for his life; Lobsinger testified about other experiences he had had from the past, not specifically what he thought about Lovelady at that time. The prosecutor argued a jury instruction was sufficient.

The trial court denied the motion for mistrial. Although it was not pleased its orders had been violated a second time, the court found that Officer Lobsinger's statement did not result in a prejudicial miscarriage of justice that could not be cured by an admonition and striking the testimony. The court stated the in limine ruling prohibiting Lobsinger's statement had been based on an inadequate foundation, not that the opinion was unduly prejudicial under Evidence Code section 352. The court reasoned, "[I]n light of the evidence that has come into this case, you've had two or three law enforcement officers who have testified that they were in such an altercation that they believed deadly force was going to be necessary. The Defense, through their opening statement, has indicated that [Michelle] is going to testify that she thought the Defendant was going to be murdered. And so in light of that testimony, that's going to come in in this case. I don't find that Officer Lobsinger's brief statement is prejudicial – is unduly prejudicial [and] a miscarriage of justice."

The court informed the attorneys it did not take violations of its orders lightly. It admonished the attorneys that if there were any further violations of its orders, the court

15

would again hear a motion for mistrial and also consider issuing an order to show cause for contempt because there had already been two violations of its orders.

### 2. Analysis

The prosecutor committed misconduct by eliciting Officer Williams's testimony that defendant was on parole and Officer Lobsinger's statement that it sounded like somebody was fighting for their life. In violation of the trial court's order, the prosecutor did not admonish his witnesses not to make those statements. As a result, the jury heard evidence the trial court had precluded.

We will defer our analysis of prejudice until after we review defendant's other claims of misconduct.

### B. Insinuating defendant was under the influence of methamphetamine

A prosecutor "may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed." (*People v. Visciotti* (1992) 2 Cal.4th 1, 52.) A prosecutor may not interrogate witnesses " 'solely "for the purpose of getting before the jury the facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might be given." ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 336.)

Defendant contends the prosecutor committed prejudicial misconduct by asking witnesses questions that insinuated defendant was under the influence of methamphetamine during the altercation. He argues the prosecutor lacked a good faith belief that defendant was actually under the influence of methamphetamine.

### 1. Background

At the scene of the eventual arrest, Officer Lovelady directed Redding Police Officer Ryan Frank to search defendant's property. Inside defendant's duffel bag, Officer Frank found what appeared to him to be a clean glass "methamphetamine pipe." Officer

16

Lovelady wrote in his report that the pipe was clean and new. He did not believe the pipe had been used to smoke methamphetamine because the pipe had no residue in it.

In an in limine motion, defense counsel sought to exclude as unduly prejudicial Officers Lovelady and Frank from testifying that they found a clean glass pipe that was used to ingest methamphetamine. The trial court asked the prosecutor whether the People were contending defendant was under the influence at the time of the altercation. The prosecutor replied, "Yeah, he seems not [to] be feeling a lot of pain when he's resisting the officers – . . . repeatedly receiving baton strikes. Goes to the People's burden to show that they were using an appropriate level of force." The prosecutor also argued that possessing the pipe could explain why defendant, who was on parole, did not want to be searched.

The trial court denied defense counsel's in limine motion on the assumption a proper foundation could be made for introducing the evidence. The court stated, "So assuming that an adequate foundation is laid that the officers located this pipe and that they have training and experience that led them to believe it is typically used for methamphetamine, I'm assuming we're going to hear from officers – and the reason I find that this is probative is I'm assuming we're going to hear from officers that it appeared to them that the Defendant was under the influence based upon his actions. [¶] And so the Court would find it relevant for those purposes as well as why the Defendant appeared to be avoiding the search."

Defense counsel by in limine motion also sought to preclude Officer Williams from testifying about "excited delirium." In his police report, Williams stated, "If [defendant] was suffering from something such as excited delirium, it was crucial he be given . . . to the next level of medical care for treatment." Defense counsel sought to exclude that statement. She argued law enforcement officers are routinely trained that "excited delirium" is a condition " 'characterized by the abrupt onset of aggression and distress, typically in the setting of illicit substance use, often culminating in sudden

17

death.' " But "excited delirium" is not recognized by the American Medical Association, the American Psychiatric Association, the World Health Organization, or in the Diagnostic and Statistical Manual of Mental Disorders. Counsel contended that Officer Williams's statement thus was speculative and lacked a proper foundation. She also contended that due to the nature of the " 'diagnosis,' " Williams was unable to form a proper opinion and lay the foundation.

The trial court denied defense counsel's motion "to the extent it seeks to exclude Officer Williams testifying about his training with regard to excited delirium and the use of force. That's different and distinct in the Court's mind [from] an officer opining that someone has a specific diagnosis or suffered from a specific medical condition. That would be an improper opinion of that witness and would likely lack foundation." Williams could testify he had been trained on excited delirium and therefore used certain measures of force, and that following the use of force, he had a concern and took defendant for medical treatment.

Officer Frank testified he searched defendant's bag. Inside the bag, he found a non-criminal amount of marijuana and what appeared to be a methamphetamine pipe. Frank testified he had seen thousands of methamphetamine pipes like the one he found in defendant's bag; they have a very distinctive appearance. This pipe was clean and unused.

Over defendant's objection, Frank explained that people typically ingest methamphetamine by smoking, snorting, or through the veins shooting up. Smoking was not the only means of ingesting the drug. Asked if based on his training and experience methamphetamine pipes lasted a long time, Frank stated they are "very breakable so they break a lot." He often discovered broken meth pipes on drug users. Frank confirmed on cross-examination there was no meth residue on the pipe and that no methamphetamine was found in defendant's possession.

18

Officer Lovelady testified he had observed Officer Frank's search of defendant's bag. Over defendant's objections throughout the questioning, Lovelady testified that pipes like the one found in defendant's bag were used to smoke methamphetamine. From his experience, someone who is using methamphetamine displays a higher pulse, uncontrollable hand movements, rapid eyelid flutters, jerky arm motions, and hallucinations. Also, people who abuse methamphetamine sometimes exhibit aggression. Lovelady stated that defendant's aggressive behavior during the altercation was consistent with someone who abused methamphetamine and exhibited aggression.

Based on his training and experience, including being a narcotics agent for four years, Officer Lovelady explained how methamphetamine could affect a person's ability to feel pain. People he spoke with talked about the drug as "a euphoric rush." Sometimes they hallucinated and were out of touch with reality. He had spoken with people who had been injured and did not realize it even though the injury was visible. But that was not true for all users. In one instance, Lovelady spoke with a person who had been stabbed in the leg; the person was using methamphetamine and had not felt it.

Officer Williams testified that he had requested an ambulance after defendant was completely restrained. When he learned the ambulance would be delayed, he arranged with the other officers present to load defendant into the back of a larger patrol vehicle and immediately transport him to the hospital. Williams did this instead of waiting for the ambulance because he was concerned with defendant's level of resistance. His heart rate could have been elevated, and other medical conditions could occur at that point.

Over defendant's objections, Officer Williams testified that one of those other conditions he was concerned about defendant having was a condition he had been trained on called "excited delirium." Williams described excited delirium as "when a subject has used stimulant and/or other type of narcotics, they can have an elevated heart rate, an extremely elevated heart rate, elevated temperature, which can cause their heart to stop."

19

2. Analysis

Defendant contends the prosecutor asked the drug-related questions to establish by insinuation that defendant was under the influence of methamphetamine during the altercation without a good-faith belief that defendant had actually used methamphetamine. There is no evidence in the record that defendant had ingested or was under the influence of methamphetamine or that he possessed methamphetamine. Defendant did not present any of the symptoms of methamphetamine use described by Officer Lovelady. The hospital medically cleared him and gave no indication he had tested positive for methamphetamine. The glass pipe had not been used to ingest methamphetamine. And none of the officers testified that they believed defendant was under the influence based on his actions. The evidence of the pipe, Lovelady's testimony that some methamphetamine users do not feel pain, and Officer Williams's testimony about excited delirium and his concern that defendant could experience that condition was insufficient to establish defendant was under the influence. Defendant argues that the prosecutor's questions thus were designed to insinuate defendant was under the influence when that fact could not be proven.

We disagree with defendant's argument. The prosecutor asked the questions to establish the reasonableness of the peace officers' use of force, not to insinuate that defendant was under the influence. The evidence established that the officers could reasonably believe defendant was under the influence and that they responded accordingly.

Whether the officers used reasonable force is an objective determination. (*Graham v. Connor* (1989) 490 U.S. 386, 397 (*Graham*).) An excessive force claim arising in the context of an arrest or investigatory stop of a free citizen invokes the Fourth Amendment, and all such claims must be analyzed under the Fourth Amendment and its "reasonableness" standard. (*Id*. at pp. 394-395.)

20

Under the Fourth Amendment's reasonableness inquiry, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (*Graham, supra*, 490 U.S. at p. 397.) This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." (*Ibid*.)

The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (*Graham, supra*, 490 U.S. at p. 396.) In making that judgment, the trier of fact is to consider the officer's training and experience. (See *People v. Lilienthal* (1978) 22 Cal.3d 891, 899.) "[R]easonable respect should be paid to police 'expertise in the area of detecting suspicious circumstances which, to an ordinary individual, might appear innocent.' " (*People v. Clayton* (1970) 13 Cal.App.3d 335, 338.) Consistent with that rule, the trial court instructed the jury that "[i]n deciding whether the arrest was lawful [i.e., whether the officers used reasonable force], consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she arrested the person." (CALCRIM No. 2670.)

Because the officers' training and experience were relevant to determining whether the officers' use of force was objectively reasonable, the prosecutor did not ask for and receive the challenged evidence without a good-faith belief. Indeed, the prosecutor did not need to establish that defendant was actually under the influence at the time of the altercation to establish the reasonableness of the officers' response. While such evidence would likely be relevant, it was not necessary to establishing that the officers acted reasonably based on the circumstances known to them and based on their past training and experience.

21

From the evidence, the jury learned that defendant's aggressive behavior, his apparent lack of feelings of pain, and his possession of a methamphetamine pipe were consistent with someone who had used methamphetamine or another stimulant. Officer Williams's concern that defendant could possibly experience excited delirium arose from his training and experience and explained why he did not wait to have defendant transported by ambulance. All this evidence was relevant to determining whether the officers' use of force under the circumstances and in light of their training and experience was reasonable. The prosecutor thus did not commit misconduct by asking the challenged questions.

### C. Prosecutor's closing argument

A prosecutor is given wide latitude during argument. (*People v. Williams* (1997) 16 Cal.4th 153, 221.) But there are limits. (*Ibid*.) Defendant contends the prosecutor committed prejudicial misconduct by making statements in closing argument that unlawfully inflamed the jurors' sympathy and support of peace officers and mischaracterized defense witness Michelle's testimony based on information not admitted into evidence.

#### 1. Sympathy towards peace officers

##### a. Background

The prosecutor began his closing argument by stating, "Police officers deserve to be safe. They have to deal with dangerous people, dangerous criminals who do not want to go to prison. We want them to do their jobs. We want them to prevent crime. We want them to go home to their families at the end of their shifts. They get to go home, and we get them back at work the next day."

The prosecutor further argued, "The question you have to ask yourselves and that you should ask each other is did the police do what we want them to do? We want the police to protect us. We need them to be able to do their jobs." The prosecutor

concluded his argument by stating, "The officers did what we ask them to do. We don't want prowlers in our neighborhoods. We don't want them to run free to commit more crimes. We want the police to interact with them, to search them, to detain them and arrest them if they committed crimes."

b.    <u>Analysis</u>

To raise a claim of prosecutorial misconduct on appeal, the defendant must first object to the argument at trial on the same ground and request the jury be admonished to disregard the argument. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.) Defendant did not object to this portion of the prosecutor's argument on the ground he asserts on appeal and thus has forfeited his claim.

Defendant argues his trial counsel rendered ineffective assistance by not objecting to the prosecutor's argument. To establish a claim of ineffective assistance of counsel, defendant must show, " 'first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125-126.)

23

To determine whether counsel's performance was deficient by not objecting, we must address the merits of defendant's substantive argument, that the prosecutor committed misconduct by appealing to the jurors' sympathies or passions about police and safety.

A prosecutor's "appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial." (*People v. Fields* (1983) 35 Cal.3d 329, 362, fn. omitted.) It is prosecutorial misconduct to " 'make arguments to the jury that give it the impression that "emotion may reign over reason" and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742.)

Defendant asserts the prosecutor's arguments about needing police to be safe and to be able to do their jobs and asking the jurors to consider whether the police did what we want them to do suggested to the jurors that their verdict carried potential social ramifications. Defendant contends the prosecutor called upon the jurors' personal feelings of duty and safety to convict defendant in order to encourage the police to do their jobs and arrest suspects—reasons unrelated to the evidence and defendant's guilt or innocence.

We must view the prosecutor's statements in the context of the argument as a whole. (*People v. Lucas* (1995) 12 Cal.4th 415, 475.) The crux of the case was whether the peace officers used excessive force against defendant. The bulk of the prosecutor's argument centered on that issue and the relevant evidence. Indeed, after introducing his argument, the prosecutor set forth the principle he would spend most of his time asserting: "All of the evidence you have is that the officers used force that was reasonable because it was necessary. It was necessary to overcome the defendant's violent resistance."

Thus, in that context, the jury would have understood that the prosecutor's question of whether the police did what we want them to do assumed that the officers'

24

use of force was reasonable and lawful. The argument implicitly emphasized to the jury that peace officers may lawfully use force when circumstances require. When considered with the bulk of the prosecutor's argument, his opening and closing arguments did not invite the jurors to convict defendant without considering whether the officers' use of force was reasonable. The argument thus was not misconduct.

Moreover, defense counsel may have had a tactical reason for deciding not to object in that an objection may have been taken by the jury as a lack of sympathy for law enforcement officer safety.

Because the prosecutor's argument was not misconduct, defendant's trial counsel did not render ineffective assistance by not objecting.

### 2. Michelle's testimony

#### a. Background

On cross-examination of Michelle, the prosecutor confirmed that Michelle heard someone screaming, saw something that upset her, thought someone was going to be killed, and thus retrieved her phone. Asked why she did not run away, Michelle stated, "Well, I had a bunch of neighbors standing around watching, so I wasn't really scared they were going to try to kill me. I didn't run away maybe because of what's been happening in the United States with all the police stuff going on. I was not scared for my own life that night; I was only scared for the person that was getting beat up. And I also did not want somebody to die on my property. That is what was in my mind."

Asked to clarify what she meant by "all this stuff that's going on in the country," Michelle stated, "Well, we've had a lot of stuff in the news where people are getting killed by the law, by the police. And so maybe that was in the back of my head, I don't – you know, I cannot tell you what all went through my head that night." She agreed that maybe she did think at the time "I better get this on video in case somebody does die." The prosecutor confirmed his understanding of her testimony by stating, "So you weren't

25

afraid; you wanted to collect evidence of something you thought would happen?"
Michelle responded, "Right. But I was still afraid for the person, not for myself. I was not afraid for myself."

Also on cross-examination, Michelle said she saw the officers deploy tasers. The dialogue continued:

"Q. [prosecutor]. Do you know what a taser is?

"A. [Michelle]. It shoots out an electrical current. That's what I saw was light, noises that sounded like electricity and looked like electricity.

"Q. You could see electricity there?

"A. Yes.

"Q. What did it look like?

"A. Green lights.

"Q. Like green lights coming from the officer shooting through the air?

"A. Coming from whatever the officer had in his hand which I assume is a taser, and then they would also scream, 'Taser' and then it would go tch tch tch. And it was green lights coming out of the taser onto whoever was on the ground.

"Q. Could the green lights be an aiming device, like laser pointer that they used to aim it?

"A. Excuse me; say that again?

"Q. You said you saw green electricity.

"A. Yeah.

"Q. And I'm asking you is it possible that what you saw was a laser pointer from the tip of the taser to where the officer was targeting?

"A. Is that possible? I guess so. I mean, I don't know. It was like a laser and it was going up and every time they would shoot it up they would say, 'Taser, taser' and then it would go off.

"Q. Do you know if the laser pointers on a taser, what color they are?

26

[¶] · · · [¶]

"A.  No, I do not.  I wasn't that close.  I've never looked at a taser up close, no."

Describing Michelle during closing argument, the prosecutor stated, "She makes stuff up.  She[] sees things that aren't there.  She's not a reliable witness.  She's a biased witness.  Do you recall when she said that she saw green lightning shooting from the officer's tasers at the defendant?  That's what she said.  She said, Tasers shoot green lightning."

Defense counsel objected on the ground of facts not in evidence.  The trial court overruled the objection, and the prosecutor continued, "She said, tasers shoot green lightning, that she saw the green the lightning, and that's how she knew that a taser was being used.

"That's not how tasers work.  It's impossible that she saw that.  The fact that she thinks she does makes her not credible.  You can't believe her because her emotional state, her response to seeing shocking – seeing something that she thought was shocking was to have her mind fill in the gaps."

On rebuttal, the prosecutor continued to address Michelle's testimony:  "She is a witness, not a very good one, but she's not a doctor or an expert in use of force.  She saw something that shocked her after being woke in the middle of the night, and her perceptions were colored by all of the stuff that's been going on in the news.  That's what she formed her opinion based on.  She – she said it on the stand; honestly, she thought that they were doing something wrong because of what she sees in the news."

Defense counsel objected, claiming the argument misstated the evidence.  The trial court overruled the objection, and the prosecutor continued, "She said she thought that they were doing something wrong because of what she sees in the news.  That's what colored her perceptions.  That's what caused her to think what was happening was not good.  [¶]  She didn't see what the defendant did.  What she saw was green lightning, which didn't happen."

27

b.     Analysis

Mischaracterizing evidence is prosecutorial misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 823.) "A prosecutor's 'vigorous' presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.' " (*Ibid*.) Relying on evidence outside the record is also misconduct. (*Id*. at pp. 827-828.) During argument, the prosecutor may refer to matters not in evidence only if those matters are common knowledge or are illustrations drawn from experience, history, or literature. (*People v. Williams, supra*, 16 Cal.4th at p. 221.)

The prosecutor misstated Michelle's testimony. In one instance, he asserted Michelle said she saw the taser emit "green lightning." Michelle actually stated she saw and heard the taser emit electricity, and that the electricity looked like green lights. When asked if the light she saw was possibly a laser pointer, Michelle agreed it was possible but did not know. The light was like a laser, and it would go on and off each time the taser was used. Michelle never used the word "lightning."

In a second instance, the prosecutor argued that Michelle testified she believed what she saw the officers doing was wrong because of what she saw in the news, and that is what colored her perception and caused her to believe the officers' actions were not good.

What Michelle actually said was she did not run away when she saw what was happening because of recent news of people being killed by police, and that was one reason why she retrieved her phone. She was not scared for her own life; she was scared for the person the police were beating. The prosecutor confirmed she was not afraid and that she did not run away because she wanted to collect evidence of something she thought might happen. Michelle did not testify that what she saw on the news led her to believe what the officers were doing was wrong.

28

The prosecutor also made an argument based on evidence that was not in the record. After stating that Michelle said she had seen green lighting and that was how she knew a taser was being used, the prosecutor stated, "That's not how tasers work. It's impossible that she saw that. The fact that she thinks she does makes her not credible." There is no evidence in the record that supports the prosecutor's assertion of how tasers do or do not work and that it would be impossible for Michelle to see what she saw. Nor do we believe that information is common knowledge. Thus, the prosecutor argued Michelle was not credible based on facts not in evidence.

D.    Prejudice

" 'A defendant's conviction will not be reversed for prosecutorial misconduct' that violates state law . . . 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Wallace, supra*, 44 Cal.4th at p. 1071.)

We have concluded the prosecutor committed misconduct by not admonishing witnesses and eliciting testimony from them that violated a court order and by misstating Michelle's testimony. Nonetheless, the errors did not so infect the trial with unfairness as to make defendant's conviction a denial of due process, nor is it reasonably probable that defendant would have received a more favorable verdict had these instances of misconduct not occurred.

Both of the comments solicited in violation of the court order were isolated, brief, and immediately struck from the record. In both instances, the court admonished the jury not to consider the evidence that had been struck for any purpose. We presume the jury followed those instructions, and there is no evidence rebutting that presumption. (*People v. Washington* (2017) 15 Cal.App.5th 19, 26.)

There is also no evidence that the prosecutor intentionally elicited inadmissible evidence. It is misconduct for a prosecutor to elicit inadmissible testimony intentionally;

29

merely eliciting evidence is not misconduct. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.) The prosecutor's questions were facially neutral. Although he had failed to inform the witnesses of the trial court's orders, there is no indication he intentionally sought to elicit inadmissible testimony through the questions he asked.

In addition, an argument exists that Officer Lobsinger's statement did not violate the trial court's order. The order prohibited Lobsinger from testifying it sounded like Officer Lovelady was in a fight for his life. But that is not what Lobsinger said. When he testified, he said that while monitoring the radio, he heard multiple mic keys and yelling. Asked to explain a mic key, Lobsinger stated that officers typically carry a mic or radio on them, and when the mic starts clicking over the radio, the other officer is most likely in a physical confrontation. He said that "you fight with somebody and the mic accidentally clicked and that just –it sounds bad because you hear yelling in the background it sounds like somebody is fighting for their life." Lobsinger was describing a typical incident from his experience, not specifically what he heard while listening to Lovelady's radio.

The misstatements of Michelle's testimony were minor. "Green lightning" is not so different from Michelle's saying she saw electricity in the form of green light. As to what Michelle had seen in the news, although she did not testify that what she saw on the news led her to believe what the officers were doing was wrong, it did lead her to retrieve her phone to make a video of the officers beating defendant, as she had seen videos in the news depicting police brutality. And although the prosecution stated without supporting evidence that tasers did not work the way Michelle had described, there was no dispute that Officers Lovelady and Williams fired their tasers at defendant.

Moreover, it is not reasonably probable that defendant would have received a more favorable verdict had the offending testimony not been elicited. Defendant argues this was a close case that was decided based on witness credibility. But all the evidence indicates defendant unlawfully resisted lawful orders, giving the officers authority to

30

apply progressive levels of force with each level of resistance. Indeed, Michelle, defendant's only eyewitness, testified she did not know whether defendant was hitting, kicking, or assaulting the officers during the beating. She did not know because it was dark, and she could not see. She also did not see what led up to the individual screaming. Her testimony thus did not significantly aid the jury in determining whether the officers' use of force was excessive under the circumstances.

The only evidence in the record is that defendant refused to comply with the officers' lawful order. As they attempted to overcome his resistance with reasonable and progressive force, he began resisting violently. Had the prosecutor not committed any of the instances of misconduct, it is not reasonably probable defendant would have received a more favorable verdict. The prosecutor's misconduct was not prejudicial.

II

*Denial of Motions for Mistrial*

A trial court should grant a mistrial " 'if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " (*People v. Cox* (2003) 30 Cal.4th 916, 953, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

Defendant contends the trial court abused its discretion when it denied his motions for mistrial made after (1) Officer Williams testified he had heard defendant was on parole, and (2) Officer Lobsinger purportedly testified that the radio transmission sounded like Officer Lovelady was fighting for his life.

A.   Motion After Officer Williams's testimony

1.   Background

We described above the incident where Officer Williams testified he had heard over the radio that defendant was on parole, in violation of a court order.  The trial court admonished the jury.  The court confirmed with Williams that he had not been admonished by the prosecutor, but it ultimately denied defendant's motion for a mistrial.  The court explained its reasons as follows:

"I am going to deny the motion for mistrial finding that the evidence, which was admitted, which was contrary to the Court's ruling in motion in limine [but] the prejudice of admitting that evidence can be cured by the instruction that the Court has given and the admonition that the Court has given.

"The Court has stricken the testimony from the record and has admonished the jurors to disregard it.  And if you would like, Ms. Carpenter [defense counsel], I will give that same admonishment again to the jurors.  The Court is relying upon *People v. Harris* [(1994)] 22 Cal.App.4th 1575, which is factually analogous to this case.  In that case, the witness inadvertently disclosed the Defendant's parole status and the trial court found that it was not an incurable prejudice, that it was properly cured by admonishing the jurors and striking the testimony.

"Also the Court reviewed *People v. Williams,* [*supra,*] 16 Cal.4th 153.  And just now reviewed the case as cited by Defense counsel, including *People v. Morgan*, which is also very factually analogous[,] 87 Cal.App.3rd 59[,] finding that the Court can cure by granting a motion to strike and giving an admonishment to the jurors – can cure the prejudice.

"As such, I am going to deny the motion for mistrial.  I would also note for the record that the Court always assumes and may presume that the jurors will follow the

32

Court's admonitions and instructions. And I'm also relying upon the fact that there has been no pattern of egregious misconduct on the part of the prosecution.

"Mr. Frazer [the prosecutor] has offered an explanation that he thought he admonished the witness but could not be certain. When we asked the witness, the witness clearly indicated that admonishment had not been given. So it is the prosecution's error in this case. And although the Court is not happy about that error, especially in light of the fact that the Court very clearly indicated to both counsel to advise their witnesses of the Court's rulings and motion in limine, I don't find that it was intentionally done or that there was any intentional misconduct on the part of the prosecution.

"The Court notes that this was a single, brief remark that was volunteered by the witness. I don't believe the prosecutor led him into volunteering that remark, because the question was there anything else that you overheard en route that was, you know, in your consideration?

"It was a similar question to the question before, and I don't think that the prosecutor was intending the witness to say, I heard the Defendant's parole status. And so for that reason, the Court finds that there was not intentional misconduct on part of the prosecution, and it was immediately addressed by the Court by striking and giving the admonition to the juror so they should disregard."

### 2. Analysis

Defendant contends the trial court abused its discretion in denying the motion for mistrial because it based its ruling largely on whether the prosecutor intentionally elicited the offending testimony. Defendant asserts that intention is an impermissible factor to consider, as neither the state nor the federal constitutional standards for prosecutorial misconduct require a showing of bad faith on the prosecutor's part. He further argues that even if the trial court could consider the prosecutor's intent, the court exceeded the

bounds of reason when it found the prosecutor did not intentionally elicit the barred testimony. The prosecutor knew before trial that Officer Williams had heard about defendant's parole status, yet he asked Williams twice what he had heard on the radio.

"There is little doubt exposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial." (*People v. Harris, supra*, 22 Cal.App.4th at p. 1580.) But whether the erroneous admission of such evidence warrants granting a mistrial or whether the error can be cured by striking the testimony and admonishing the jury rests in the trial court's discretion. (*Id.* at p. 1581.) "[I]t is only in the 'exceptional case' that any prejudice from an improperly volunteered statement cannot be cured by appropriate admonition to the jury." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 955.)

To establish prosecutorial misconduct, the defendant need not show the prosecutor acted in bad faith. (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) The evidence's disclosure may harm the defendant whether or not it was committed intentionally. (*People v. Hill, supra*, 17 Cal.4th at pp. 822-823.) However, it is not misconduct for a prosecutor to elicit inadmissible testimony from a reasonable, if mistaken, effort to elicit admissible evidence. (*People v. Parker* (2022) 13 Cal.5th 1, 76.) The trial court found no evidence suggesting the prosecutor's question was anything more than that.

"The California Supreme Court has consistently found vague and fleeting references to a defendant's past criminality to be curable by appropriate admonition to the jury." (*People v. Franklin, supra*, 248 Cal.App.4th at p. 955, and cases cited therein.) A curative instruction to disregard improper testimony ordinarily is sufficient to protect a defendant from the injury of that testimony, and we presume a jury is capable of following such an instruction. (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 834.)

In the present case, the testimony of defendant's parole status was brief and did not disclose the nature of defendant's prior crimes. The trial court immediately struck the offending testimony from the record and admonished the jury to disregard it.

34

Additionally, the evidence against defendant was very strong. Generally, "[i]mproper evidence of prior offenses results in reversal only where the appellate court's review of the trial record reveals a closely balanced state of the evidence." (*People v. Stinson* (1963) 214 Cal.App.2d 476, 482.) As we have already determined, had the misconduct not occurred, it is not reasonably likely defendant would have received a more favorable verdict. Under these circumstances, we conclude the trial court did not abuse its discretion by denying defendant's first motion for a mistrial.

B.     Motion After Officer Lobsinger's testimony

1.     Background

As explained above, Officer Lobsinger testified that as he was responding to the scene, he heard multiple mic keys and yelling over the radio. In his experience, this typically indicated the other officer was involved in a physical altercation. When an officer hears this, "it sounds bad because you hear yelling in the background it sounds like somebody is fighting for their life."

The trial court struck Officer Lobsinger's last statement from the record and admonished the jury to disregard it. It excused the jury, and then it asked Lobsinger if he had been instructed on the court's in limine ruling that his opinion that Officer Lovelady was in a fight of his life was excluded from testimony. Lobsinger did not recall being instructed. Defendant moved for mistrial, and the court ultimately denied the motion. It stated:

"So declaring a mistrial, the law indicates that the Court must make very specific findings because of the severity of the action taken in declaring a mistrial. And specifically the Court must find that there's such prejudice that it cannot be cured by any type of corrective or curative action.

"And in this case the Court's ruling with regard to the offer of proof as to Officer Lobsinger's testimony was very specific. The Court ruled that he could not offer the

opinion that Officer Lovelady was in a fight for his life based upon what he heard on the radio.  And if you reflect back to what I believe I stated on the record as to the basis for that opinion or for that ruling wasn't under 352, it was the fact that there was an inadequate foundation.

"In other words Officer Lobsinger wasn't present at the time, he's hearing something that's on the radio that is an altercation, and the Court didn't find that was a sufficient foundation to determine that Officer Lovelady was in a fight for his life.  And so the Court's recollection of its ruling and motions in limine that it was an improper opinion that lacked foundation.

"And so what happened today, I believe Officer Lobsinger was indicating that based upon what he heard he felt that Officer Lovelady was in a fight for his life.  But I don't have the specific words he used; Mr. Frazer has heard it differently.

"But regardless, in light of the evidence that has come into this case, you've had two or three law enforcement officers who have testified that they were in such an altercation that they believed deadly force was going to be necessary.  The Defense, through their opening statement, has indicated that [Vanessa] is going to testify that she thought the Defendant was going to be murdered.  And so in light of that testimony, that's going to come in in this case.  I don't find that Officer Lobsinger's brief statement is prejudicial – is unduly prejudicial in this case and is such that, as Ms. Carpenter argued, that it's a miscarriage of justice.

"So although the Court is not pleased that we have a second violation of the Court's orders and motion in limine, I cannot find that it rises to the level of prejudice such that it cannot be cured by an admonition and striking the testimony, which the Court has done, such that the Court should declare a mistrial.

"However, because this has happened twice and this is not something the Court takes lightly and not something the Court wants to be faced with, but if we have any further violations of the Court's order, the Court will again hear a motion for mistrial but

36

also contemplate the issuance of an order to show cause with contempt because that has now been two violations of the Court's orders in this case.

"And so, you know, counsel, whatever we have to do to properly instruct our witnesses needs to be done to avoid this from happening again. So the Court is denying the motion for a mistrial finding that this could be cured and it is not – does not rise to a level of a miscarriage of justice, especially in light of the evidence presented in this case. However, it is an improper opinion, and the Court is striking it for that reason."

2.     Analysis

The trial court did not abuse its discretion by not granting the second motion for a mistrial. By the time Officer Lobsinger had testified, the jury had already heard that defendant and Officer Lovelady had exchanged blows, and as defendant's resistance increased, pepper spray, batons, tasers, and a dog were used to no avail to restrain defendant. Defendant had assaulted Officer Lovelady multiple times, and it took the strength of three men to hold him down to handcuff him. And defendant had screamed through much of the conflict. Thus, when the jury heard Lobsinger testify generically that when listening to a fight on the radio "it sounds like somebody is fighting for their life," it heard nothing prejudicial or inconsistent with what the jury had already heard from testimony.

Moreover, the trial court's concern about the evidence was its lack of foundation to the extent it was referring specifically to Officer Lovelady being in a fight of his life, not that the evidence was unduly prejudicial. And when Officer Lobsinger testified, he did not refer specifically to Lovelady but rather spoke about his experience in hearing fights over the radio. Thus, the foundational concern was not present. The court thus did not abuse its discretion by not granting a mistrial over Lobsinger's statement.

III

*Evidence of Excited Delirium and the Glass Pipe*

Defendant contends the trial court abused its discretion by admitting evidence of excited delirium and the glass pipe.  We review the trial court's rulings on the admission of evidence for an abuse of discretion, including the court's finding of the evidence's prejudicial impact under Evidence Code section 352.  (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

A.    Excited delirium

Defendant contends the trial court erred in admitting evidence of excited delirium because the prosecution did not lay a sufficient foundation.  He argues that Officer Williams did not explain why defendant's level of resistance or any symptoms he exhibited led Williams to believe defendant suffered from excited delirium.  Williams's testimony that symptoms of excited delirium were a manifestation of narcotic use exceeded the trial court's in limine order allowing the evidence.  Williams never saw defendant use narcotics or receive information that he was under the influence.  Thus, defendant argues, instead of providing context for Williams's decision to take defendant to the hospital, Williams's testimony was an unsupported opinion that defendant suffered from excited delirium and was purely a backdoor maneuver to assert to the jury that defendant was under the influence during the altercation.  Defendant claims the evidence was speculative, irrelevant, and lacked foundation.

Defendant mentions that recent action by the Legislature establishes that excited delirium is not a valid medical diagnosis, in agreement with the argument made by defense counsel at trial.  Effective January 1, 2024, the Legislature declared that excited delirium is not recognized as a valid medical diagnosis or cause of death in California, and peace officers are prohibited from using the term "excited delirium" to describe an individual in an incident report.  (Health & Saf. Code, §§ 24401, 24402.)  An officer may

38

describe the characteristics of a person's conduct, but the officer may not generally describe the person's demeanor, conduct, or physical and mental condition at issue as excited delirium. (Health & Saf. Code, § 24402.)

Defendant acknowledges that the Legislature did not indicate that these statutes applied retroactively, nor did the Legislature specifically preclude the use of excited delirium in criminal actions. But he asserts it is important to note the Legislature's recognition of the illegitimate nature of the term "excited delirium" and that it is not a valid medical diagnosis.

The trial court did not abuse its discretion by admitting Officer Williams's testimony concerning excited delirium. The trial court denied defendant's motion against admitting the evidence "to the extent it seeks to exclude Officer Williams testifying about his training with regard to excited delirium and the use of force. That's different and distinct in the Court's mind [from] an officer opining that someone has a specific diagnosis or suffered from a specific medical condition. That would be an improper opinion of that witness and would likely lack foundation."

Citing *People v. Lilienthal, supra*, 22 Cal.3d 891, the trial court stated that an officer's training was relevant and admissible. "So the extent that Officer Williams testifies that he has been trained to recognize that as a concern – 'that' being excited delirium – and therefore uses certain measures of force and that following the use of force he had a concern and took the Defendant for medical treatment, that is all admissible testimony and based upon the officer's training and experience and his personal observations of the altercation at hand. [¶] The officer would be precluded from testifying that the Defendant, in fact, suffered excited delirium or was diagnosed with such. That would be an improper opinion."

The prosecutor set an adequate foundation to admit the evidence. After asking Officer Williams why he wanted to take defendant to the hospital instead of waiting for an ambulance, Williams stated that from his experience, he was concerned about the

39

medical conditions defendant could potentially have due to the altercation. He was concerned about a specific medical condition he had seen in his training and experience. The prosecutor next laid further foundation by having Williams describe the training he had received regarding medical conditions, and in particular medical conditions a suspect may exhibit after an altercation with officers. From that training, Williams was concerned about defendant experiencing excited delirium. Then Williams explained from his training what the condition was. The condition could arise when a suspect has used a stimulant or other type of narcotic, and the suspect can have an elevated heartrate and an elevated temperature which can cause the suspect's heart to stop.

Consistent with the trial court's ruling, Officer Williams did not testify as to whether in his opinion and from observing defendant's condition and symptoms, defendant was actually suffering from excited delirium. Rather, he testified that, based on his training and experience, he was concerned that defendant could have the condition due to the altercation, and that was why he had defendant transported to the hospital quickly.

While the new legislation establishes that Officer Williams may no longer use the term "excited delirium" to describe an individual in an incident report, defendant does not contend that the legislation is retroactive to this matter or that it would bar the testimony Williams gave. Because the trial court limited Williams to testifying about excited delirium as a matter understood from his training and experience and a reason why Williams transported defendant to the hospital quickly, the court did not abuse its discretion admitting the evidence.

B.    Glass pipe

Defendant contends the trial court abused its discretion in admitting evidence that he was in possession of a glass pipe because the factual basis for the court's ruling was not supported by substantial evidence. The prosecution asserted the officers would testify

that defendant appeared to be under the influence based on his actions, but the officers never so testified. They testified they were surprised at his level of resistance to the force used against him. Officer Lovelady testified that some people who abuse methamphetamine exhibit aggression, and that was consistent with how defendant acted, but Lovelady never testified he believed defendant was under the influence.

Defendant also contends that the trial court's finding that the glass pipe was relevant to explain why he resisted lacked substantial evidence and was arbitrary and capricious. There was no evidence why defendant resisted being searched, and his reason for refusing the search was irrelevant to the elements of the charged crimes. Also, the pipe was clean and unused, and there was no evidence to suggest defendant had used the pipe to consume methamphetamine at any time. Defendant argues that evidence of the pipe was thus irrelevant and not probative to the criminal charges.

The trial court did not abuse its discretion. The evidence was relevant to explain how defendant's behavior in resisting arrest was consistent with someone who had used methamphetamine. Officers Lovelady and Williams testified from their experience and training that people who abuse methamphetamine sometimes exhibit aggression and do not feel pain. Defendant's behavior was consistent with those traits. Thus, it was apparent to the officers that defendant was potentially under the influence of methamphetamine at the time of the altercation. His possessing a glass pipe commonly used to smoke methamphetamine was thus relevant to the officers' perception of the situation and whether they used excessive force. The pipe was also relevant to explain why someone who was subject to warrantless searches may have resisted arrest.

Even if the trial court erred in admitting the evidence of excited delirium and the glass pipe, the error was not prejudicial. We review the erroneous admission of evidence for prejudice under the *Watson* standard and determine whether it is reasonably probable defendant would have received a more favorable result had the errors not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

41

A more favorable result is not reasonably probable. Had the evidence not been admitted, the jury still would have learned from Officers Lovelady and Williams that based on their experience and training, defendant's aggressiveness and his lack of a response to pain were consistent with some individuals who abuse methamphetamine. The jury also would still have the evidence of defendant's actual resistance and the progressive elevation of force in response to defendant's progressive resistance. Thus, even without evidence of excited delirium and the glass pipe, it is not reasonably probable defendant would have received a more favorable verdict.

IV

*Cumulative Error*

Defendant contends the cumulative impact of the alleged prosecutorial and evidentiary errors denied him a fair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

We have concluded the prosecutor committed misconduct by not admonishing two witnesses not to testify of defendant's parole status or that someone sounded like he was in the fight of his life, mischaracterizing Michelle's testimony as saying she saw "green lightning" when the taser was used and saying she based her opinion of the officer's behavior on current news, and discrediting Michelle's testimony with an understanding of how tasers operated that was not in evidence.

We have found that each of these errors was not prejudicial under the circumstances, and we find that the errors were not collectively prejudicial. The jury already knew defendant was subject to warrantless searches, the reference to "fight of his life" was generic and not specific to Officer Lovelady, Michelle did say the laser emitted

42

green light, that news of police brutality was part of her thinking but not for the purpose argued by the prosecutor, and the off-the-record understanding that tasers did not emit green lightning did not undercut Michelle's testimony that the taser emitted electricity and green light. These errors did not result in defendant not receiving a fair trial.

V

*Senate Bill No. 567*

Defendant contends he is entitled to resentencing under amendments to section 1170 made by Senate Bill No. 567 (Senate Bill 567) creating a presumption for the low term if the defendant suffered childhood trauma. Defendant was sentenced to an upper term sentence on count 1 before Senate Bill 567 became effective in 2022. The new legislation makes the low term the presumptive term where the defendant experienced psychological, physical, or childhood trauma, including abuse, neglect, exploitation, or sexual violence. (§ 1170, subd. (b)(6)(A).) It also imposes conditions on when an upper term may be imposed. (§ 1170, subd. (b).)

According to defendant's statement contained in the probation report, defendant was subject to childhood trauma, and thus would benefit from sentencing changes imposed under Senate Bill 567.

Senate Bill 567 applies retroactively to defendant. (*People v. Lynch* (2024) 16 Cal.5th 730, 748-749.) The Attorney General agrees with defendant that remand for resentencing is warranted so the trial court may resentence defendant in accordance with Senate Bill 567. We agree with the parties and will remand this matter for a full resentencing.

## VI

### Pitchess *Motion*

Defendant filed a *Pitchess*[1] motion requesting the trial court review and disclose any information related to excessive force and untruthfulness contained in the employment personnel records of Warden Galwey and Officers Lovelady and Williams. The trial court reviewed the records in camera and announced in open court that none of Galwey's records would be disclosed, and that it did not find anything in Lovelady's and Williams's records it would order be disclosed except relating to one of Lovelady's prior employers. The court ordered the records and transcripts of the hearings be sealed.

Defendant has requested that we review the sealed record to determine whether the trial court abused its discretion in determining that none of the personnel files contained discovery material favorable to defendant under *Pitchess* or *Brady v. Maryland* (1963) 373 U.S. 83, 87. The Attorney General does not object to defendant's request.

We review a trial court's decision on the discoverability of material in police personnel records under an abuse of discretion standard. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.) We have reviewed the sealed personnel records that the trial court reviewed and which were filed with this court, and we have found no disclosable evidence. The trial court did not abuse its discretion in not disclosing any information from the personnel files (except for the prior employment information).

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

DISPOSITION

The judgment is affirmed.  The matter is remanded only for a full resentencing in accordance with all applicable laws.

                                        _____

                                        HULL, Acting P. J.

We concur:

_____

BOULWARE EURIE, J.

_____

WISEMAN, J.*

---

\*  Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.